1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MARCUS QUINN BLAIR, JR.,

11            Petitioner,                No. CIV S-06-0556 LKK DAD P

12        vs.

13   LE ANN CHRONES,

14            Respondent.          FINDINGS & RECOMMENDATIONS

15   _____/

16            Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered

18   against him on August 11, 2003 in the Solano County Superior Court on charges of second

19   degree murder with a sentencing enhancement for use of a rifle in the commission of the offense.

20   He seeks relief on the grounds that juror misconduct deprived him of the right to a fair trial, and

21   the trial judge violated his right to due process by failing to properly respond to two questions

22   from the jury.  Upon careful consideration of the record and the applicable law, the undersigned

23   will recommend that petitioner's application for habeas corpus relief be denied.

24   /////

25   /////

26   /////

                                1

PROCEDURAL AND FACTUAL BACKGROUND[1]

Appellant was convicted of murdering Leroy McCain.

McCain lived in an apartment in Fairfield with his girlfriend Shirley Perry. During the early morning hours of August 26, 2002, appellant knocked on McCain's door. McCain answered and went outside to speak with appellant. Perry heard "scuffling" and she went out to investigate. She saw appellant and McCain fighting. Perry tried to separate the men. She told them to take their dispute downstairs.

Appellant went downstairs. Monica Owens, who was staying with McCain and Perry, threw a bottle at appellant from the balcony. Appellant became enraged.

Appellant went to the parking lot of the apartment complex and got into the passenger seat of a parked car. Perry followed appellant while McCain watched from the complex's entrance tunnel. When appellant saw McCain, he told the driver of the car to open the hood.

After a few minutes, appellant went to the hood and removed a rifle from the car's engine compartment. Perry tried to restrain appellant. Appellant pushed past her and ran toward the apartment complex. Perry told McCain to run. McCain ran in the opposite direction. Appellant fired at McCain. As McCain tried to run up the stairs, appellant said, "I got you now, you, mother-fucker." Appellant fired again. McCain collapsed. Appellant left the apartment complex. As he passed Perry, he "shook his head and smiled like he had to do it."

McCain was killed by a single shot that entered his back, damaged his lung, and then exited through his chest.

Later that day, appellant called his mother and told her "he was going to prison for a very long time[.]"

---

[1] The following summary is drawn from the December 23, 2004 opinion by the California Court of Appeal for the First Appellate District (hereinafter Opinion), designated as Exhibit D to respondent's Answer, at pgs 1-3. This court presumes that the state court's findings of fact are correct unless petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004). "Clear and convincing evidence " within the meaning of § 2254(e) "requires greater proof than preponderance of the evidence" and must produce "an abiding conviction" that the factual contentions being advanced are "highly probable." Cooper v. Brown, 510 F.3d 870, 919 (9th Cir. 2007) (quoting Sophanthavong v. Palmateer, 378 F.3d 859, 866 (9th Cir. 2004)). Petitioner has not overcome the presumption with respect to the events underlying his conviction. This court will therefore rely on the state court's recitation of the facts.

1   Based on these facts, an information was filed charging appellant
    with murder. (§§ 187, 189.) As is relevant here, the information
2   also alleged appellant had personally used a firearm and caused
    McCain's death within the meaning of section 12022.53,
3   subdivision (d).

4   The case went to a jury trial where the prosecutor presented the
    evidence set forth above. Appellant testified on his own behalf.
5   He admitted he went to McCain's apartment on the night in
    question and that he and McCain had gotten into a fight.
6   According to appellant, as he was leaving, someone hit him on the
    head with a bottle. Appellant was "terrified" and fled to his car.
7   Instead of leaving, however, appellant retrieved a rifle. He walked
    toward McCain who was standing in the apartment's tunnel.
8   McCain retreated around the corner of a building. Appellant
    followed in an effort to "defend" himself. When appellant looked
9   around the corner, he saw McCain standing nearby. Thinking
    McCain was about to attack, appellant started firing and continued
10  to fire as McCain ran away. As soon as McCain was out of sight,
    appellant stopped firing and left.

11
    The jurors considering this evidence convicted appellant of second
12  degree murder and found the use allegation to be true.
    Subsequently, the trial court sentenced appellant to 40 years to life
13  in prison.

14                                ANALYSIS

15  I. Standards of Review Applicable to Habeas Corpus Claims

16          A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

17  some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860,

18  861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

19  Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the

20  interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

21  Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas

22  corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377

23  (1972).

24          This action is governed by the Antiterrorism and Effective Death Penalty Act of

25  1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d

26  /////

                                        3

1   1062, 1067 (9th Cir. 2003).  Tile 28 U.S.C. § 2254(d) sets forth the following standards for

2   granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall
> not be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of the
> claim -
>
> (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

10  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362

11  (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision

12  does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review

13  of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See

14  also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

15  we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such

16  error, we must decide the habeas petition by considering de novo the constitutional issues

17  raised.").

18          The court looks to the last reasoned state court decision as the basis for the state

19  court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned

20  state court decision adopts or substantially incorporates the reasoning from a previous state court

21  decision, this court may consider both decisions to ascertain the reasoning of the last decision.

22  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court

23  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

24  habeas court independently reviews the record to determine whether habeas corpus relief is

25  available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle

26  v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not

4

1  reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

2  AEDPA's deferential standard does not apply and a federal habeas court must review the claim

3  de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

4  II.  Petitioner's Claims

5       A.  Juror Misconduct

6           Petitioner claims that his constitutional rights were violated "as a result of

7  multiple instances of jury misconduct."  (Pet. at pg. 7 of 20.)  In support of this claim, petitioner

8  has included declarations from two of the jurors at his trial.  (Id. at pgs. 15-20 of 20.)  The

9  California Court of Appeal explained the background to petitioner's claim of juror misconduct,

10  and its decision thereon, as follows:

11           1.  Background

12           Appellant filed a motion for new trial based on juror misconduct.
             He supported his motion with declarations from two jurors.  The
13           first, Juror H., said her experience as a juror had been "extremely
             stressful."  According to Juror H. the "foreperson stated several
14           times that my opinion could not be correct because it was 'eleven
             to one.'"  Juror H. also described what appellant characterized as
15           four instances of misconduct.  First she said that on the "second
             day of deliberations, juror number 2 brought a legal dictionary into
16           the jury room, and began reading definitions of various terms to the
             jurors.  Among the definitions that I can recall, were the definitions
17           of reasonable force and of a reasonable man.  The definition of a
             reasonable man was discussed in the context of whether the
18           defendant acted as a reasonable man in accordance with the judge's
             instructions regarding voluntary manslaughter.  The definition of
19           reasonable force was discussed in the context of whether the
             defendant used reasonable force if in fact he was defending
20           himself."

21           Second, Juror H. said the "jury foreperson purported to be
             knowledgeable about other legal cases regarding spousal abuse and
22           heat of passion.  On at least two occasions the foreperson cited
             other legal cases and stated that these cases were not her opinion
23           but 'fact and law' and had to be considered in the definition of
             passion.  She also stated that she knew more about these cases
24           [than] me."

25           Third, Juror H. said that "[d]uring deliberations, the foreperson, as
             well as other jurors, discussed their own opinions, based on their
26           own experience and claimed 'expertise', regarding the ballistics of

5

a .22 caliber rifle bullet and its effects on a human body.  These discussions included the 'fact' that a .22 caliber bullet striking a body would 'bounce around inside', and other characteristics of .22 caliber rifles and ammunition."

Finally, Juror H. said that on the "second day of deliberations I had five questions related to voluntary manslaughter which I requested that the foreperson ask the judge.  These questions were intended [to] clarify disagreements between some jury members and me regarding issues of provocation, a reasonable person's background, and the duration of passion.  Three of these questions were asked.  The foreperson refused to ask two of the questions.  One of the unasked questions was whether fear, anger, hysteria and rage were included in the definition of passion.  The other unasked question related again to a legal time period for heat of passion.  The foreperson refused to ask these two questions stating that agreement on these issues had already been reached."

Appellant also submitted a declaration from Juror K.  He said, "On the second day of deliberations, one of the jurors brought in a dictionary and read several definitions.  Of those I remember were the definitions of 'heat of passion' and 'reasonable.' [¶] Eventually, one of the jurors told the juror with the dictionary that it was not proper and he should put the dictionary away."'"

The prosecutor opposed appellant's motion for new trial and submitted two declarations in response.  The first, from the foreperson, Juror S. stated, "On ... the second day of deliberations, Juror Jean [B.] brought a legal dictionary to deliberations.  Mr. [B.] read a portion of the dictionary to the jurors relating to the word 'reasonable.'  Another juror pointed out that using the dictionary was improper.  I asked Mr. [B.] to put away the dictionary and he did.  [¶]  After Mr. [B.] put away the dictionary, a final three questions [were] sent to the court.  Judge Garrett responded to the last question by explaining the law in open court.  [¶]  After Judge Garrett explained the law, no jurors requested that additional questions be asked."

The prosecutor also submitted a declaration from Juror B.  It stated, "On ... the second day of deliberations, I brought in my copy of Black's Law Dictionary ... into deliberations.  I was unaware that bringing the dictionary was improper.  [¶]  I brought the dictionary to answer questions Juror # 12 was continuously asking.  I looked up and read the definitions of 'heat of passion' and 'reasonable.' The definitions I read to the jurors are attached to this declaration.[2]

---

[2] The dictionary defined "heat of passion" as follows:  "In criminal law, a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter.  Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at

1    [¶] One of the other jurors told me that we were not supposed to use outside sources of information.  Another juror told me to put away the dictionary.  I then put the dictionary away.  [¶]  The foreperson then presented Juror # 12's questions to the court.  Judge Garrett read the same jury instructions the other jurors had been reading to Juror # 12."

The trial court considered appellant's motion and the conflicting declarations and declined to grant appellant a new trial.  The court found that bringing the dictionary into deliberations and using it was misconduct, but ruled that appellant did not suffer any prejudice.  The court found appellant's three other allegations of misconduct to be not meritorious.

2. Controlling Law

As a general rule, juror misconduct raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted.  (People v. Majors (1998) 18 Cal.4th 385, 417.)  In determining whether misconduct occurred, we accept the trial court's credibility determinations and findings on question of historical fact if supported by substantial evidence.  (Ibid.)  Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact that is subject to an appellate court's independent determination.  (Ibid.)

With these principles in mind, we turn to the specific allegations.

a.  Use of the Dictionary

Appellant contends, the trial court held, and the People concede, that bringing the legal dictionary into the deliberations and using it to define legal terms[3] constituted misconduct.  (See People v. Karis (1988) 46 Cal.3d 612, 642.)  The key issue here is whether that misconduct was prejudicial; i.e., whether it is substantially likely that one or more of the jurors were biased by the extraneous

/////

—————————————————————————

the time.  The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror."

The dictionary defined "reasonable" as follows:  "Fair, proper, just, moderate, suitable under the circumstances.  Fit and appropriate to the end in view.  Having the faculty of reason; rational; governed by reason; under the influence of reason; agreeable to reason. Thinking, speaking, or acting according to the dictates of reason. Not immoderate or excessive, being synonymous with rational, honest, equitable, fair, suitable, moderate, tolerable."

[3]  There is conflicting evidence about which words the jurors looked up in the dictionary. Appellant has limited his argument to the use of the dictionary to define the terms "heat of passion" and "reasonable."  We will limit our analysis accordingly.

7

1    material.  (In re Carpenter (1995) 9 Cal.4th 634, 653.)  We
     conclude the answer is no.

2

3    First, while it is undisputed that Juror B. brought the dictionary
     into the deliberations and used it, it is also undisputed that the
     jurors themselves identified the misconduct and corrected it.  The
4    declarations submitted by appellant and the prosecution both show
     the other jurors told Juror B. it was improper to rely on outside
5    sources and that he should put the dictionary away.  The
     declarations also show that Juror B. unhesitatingly complied.  We
6    think it is unlikely that the jurors, having recognized that it was
     wrong to rely on definitions taken from a dictionary, and having
7    taken corrective action, would thereafter rely on definitions from
     the forbidden source.

8

9    This conclusion is supported by the circumstances under which the
     dictionary use occurred.  Appellant contends, and the record
10   demonstrates that Juror 12 was grappling with the issue of whether
     appellant acted reasonably and in the heat of passion when he shot
     McCain.  According to the record, Juror B. used the dictionary in
11   an attempt to help juror 12 understand those concepts.  However,
     when the other jurors told Juror B. it was improper to rely on the
12   dictionary, the jurors immediately took an alternative step to
     advance their deliberations.  They asked the trial judge to clarify
13   the troublesome terms.[4]  The fact that the jurors submitted their
     questions to the judge tends to show they understood they should
14   not and were not relying on the dictionary definitions.

15   Finally, the nature of the case demonstrates that the misconduct
     was not prejudicial.  As our Supreme Court has stated, "the
16   stronger the evidence, the less likely it is that the extraneous
     information itself influenced the verdict."  (In re Carpenter, supra,
17   9 Cal.4th at p. 654.)  Here, as the trial court explained, the case
     against appellant was extraordinarily strong. ". . . [T]his was a
18   situation where the defendant went over to the home of this victim
     and began causing trouble.  These people were at their home
19   minding their own business when the defendant presented himself
     in the evening and began creating problems.  The victim was
20   unarmed.  The evidence is undisputed that the victim remained
     unarmed.  The defendant, after leaving the premises and being hit
21   with – in an attempt to hit with a bottle, [sic.] left the area and
     proceeded to a car where he had a gun secreted under the hood of
22   that car.  [¶] . . . [¶]  The evidence in this case establishes that the
     defendant seized the gun and went back to the area where the
23   victim was located.  The evidence is undisputed that the victim fled
     from the defendant.  And that during this flight, the defendant shot

24

25       [4]  Appellant contends the trial court failed to respond to the jury's questions appropriately.
26   We will address this argument post.

8

him in the back.   [¶] This court concludes that the jury could easily have found the defendant guilty of murder in the first degree based on a willful, premeditated, deliberate murder, but they did not do so.  This Court concludes that the evidence in this case was overwhelming regarding the defendant's guilt, and that the strength of the case is sufficient to neutralize any prejudice that would have endured from this misconduct of this juror in bringing in a dictionary and reading these few definitions."

Based on all these factors, we conclude it is not substantially likely that any of the jurors were prejudiced by exposure to the extraneous material at issue.  (In re Carpenter, supra, 9 Cal.4th at p. 653.)

b.  Heat of Passion

Appellant contends the jury foreperson committed misconduct because she claimed to be "knowledgeable" about "heat of passion."  This was misconduct, appellant contends, because it "interjected extraneous information into the deliberations."

A juror commits misconduct by asserting a "claim to expertise or specialized knowledge of a matter at issue . . . ."  (In re Malone (1996) 12 Cal.4th 935, 963.)  However, it is "not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial.  Jurors' views of the evidence . . . are necessarily informed by their life experiences, including their education and professional work."  (Ibid.)

The claim of misconduct that appellant has asserted here is weak. While Juror H.'s declaration states the foreperson claimed to be "knowledgeable" about "heat of passion" and that she "cited other legal cases" that dealt with the issue, the declaration does not explain precisely what the foreperson allegedly said.  We do not know whether the foreperson expounded on the terms and if she did, whether her explanation was flawed in any way.  We do not know whether the foreperson's possible explanation was inconsistent with the instructions that were given by the court.  The declaration appellant submitted falls far short of the "concrete evidence" normally required to establish juror misconduct. (People v. Majors, supra, 18 Cal.4th at p. 425.)

In any event, assuming for the sake of argument that the juror's remarks did constitute misconduct, we find no prejudice.  The comments appellant has described are so vague and nonspecific that they are unlikely to have influenced anyone at all.  Reviewing the entire record we find no substantial likelihood that any juror was biased as a result of the misconduct alleged.  (In re Carpenter, supra, 9 Cal.4th at p. 653.)

/////

9

1

c.  Ballistics

2

Appellant contends the foreperson and other jurors committed
misconduct when they claimed "expertise regarding the ballistics
3
of a .22 caliber rifle bullet and its effects on the human body."  The
discussions included the "'fact' that a .22 caliber bullet striking a
4
body would 'bounce around inside.'"

5

Again, we will assume for the sake of argument that the statements
appellant has identified are misconduct because they are based on
6
the jurors' alleged specialized expertise.  (In re Malone, supra, 12
Cal.4th at p. 963.)  However, again we find no prejudice.  The path
7
of the fatal bullet as it passed through McCain's body was not
material to any issue that was in dispute at trial.  Indeed, the only
8
potential prejudice appellant has identified is that the jurors'
statements contradicted the testimony of the pathologist who
9
testified that the fatal bullet passed through McCain's body in a
"straight line."  However, whether the bullet passed through
10
McCain's body in a "straight line" or whether it "bounced around
inside" before passing through was not relevant.  Any possible
11
misconduct was not prejudicial.  (Cf. People v. Cabrera (1991) 230
Cal.App.3d 300, 305-306 [Spanish-speaking juror's misconduct in
12
translating defendant's testimony for other jurors not prejudicial
because the difference in translation was factually irrelevant to the
13
case]; People v. Sutter (1982) 134 Cal.App.3d 806, 821 [juror's
unauthorized view of crime scene was not prejudicial because "the
14
scene of the crime was not at issue"].)

15

d.  Failure to Submit Questions

16

Appellant contends the jury foreperson committed misconduct
because she failed to submit to the trial judge two of the questions
17
Juror H. had formulated.  Specifically, appellant contends the
foreperson failed to ask (1) "'whether fear, anger, hysteria and rage
18
were included in the definition of passion,'" and (2) failed to
inquire about a "'legal time frame for heat of passion.'"

19

There could be no misconduct concerning the second question
20
because it was submitted to the trial judge not just once, but twice.
Apparently at Juror H.'s behest, the foreperson submitted a
21
question stating they needed "a time frame model to conclude heat
of passion."  When the trial judge responded that she did not
22
understand the question, the foreperson reformulated the request.
She said the jurors needed "a time frame model to conclude heat of
23
passion.  Is there a time frame associated with the commission of a
crime committed 'in the heat of passion.'"  Appellant's argument
24
on this point is based on a false premise.

25

Turning to the other question, we are not convinced appellant has
shown misconduct.  While jurors clearly have the right to submit
26
questions to the trial judge, (§ 1138) appellant has not cited, and

1

2

3
we have not found, any authority that holds a jury foreperson
commits misconduct if he or she fails to submit all questions that
are formulated by the other jurors.  Absent such authority, we are
reluctant to adopt that rule.

4

5

6

7

8

9

10

11
In any event, assuming misconduct, we find no prejudice.  While
the foreperson did not ask "whether fear, anger, hysteria and rage
were included in the definition of passion" the foreperson did ask
three other questions that had been posed by Juror H.  In the course
of answering those other questions, the court also answered the
omitted question.  Specifically, the court told the jurors "The heat
of passion which will reduce a homicide to manslaughter must be
such a passion as naturally would be aroused in the mind of an
ordinarily reasonable person in the same circumstances.  A
defendant is not permitted to set up his own standard of conduct
and to justify or excuse himself because his passions were aroused,
unless the circumstances in which the defendant was placed and
the facts that confronted him were such as also would have aroused
the passion of the ordinarily reasonable person faced with the same
situation."

12

13

14

15
This instruction makes clear that any emotion, whether fear, anger,
hysteria or rage, can support heat of passion, so long as the
response, "naturally would be aroused in the mind of an ordinarily
reasonable person in the same circumstances."  Since the trial court
effectively answered the omitted inquiry, we conclude there is no
reasonable probability of actual harm to appellant resulting from
the misconduct alleged.  (In re Hitchings (1993) 6 Cal.4th 97, 119.)

16 (Opinion at 3-10.)  In the instant petition, petitioner complains about the same instances of juror

17 misconduct described by the state appellate court.  (Pet. at pages 7, 8 of 20, Traverse at 3-4.)

18         Under the Sixth Amendment, a criminal defendant has the right to be tried by an

19 impartial jury and to confront and cross-examine the witnesses who testify against him.  See

20 Irvin v. Dowd, 366 U.S. 717, 722 (1961); Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987).  The

21 defendant is also entitled to a jury that reaches a verdict on the basis of evidence produced at

22 trial.  Turner v. Louisiana, 379 U.S. 466 (1965); Estrada v. Scribner, 512 F.3d 1227, 1238 (9th

23 Cir. 2008); Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir. 1986) ("Jurors have a duty to

24 consider only the evidence which is presented to them in open court.").  The introduction of

25 prejudicial extraneous influences into the jury room constitutes misconduct which may result in

26 the reversal of a conviction.  Parker v. Gladden, 385 U.S. 363, 364-65 (1966).  However, it is not

1   improper for a juror to bring his or her outside experiences to bear during deliberations.  See

2   Grotemeyer v. Hickman, 393 F.3d 871, 878 (9th Cir. 2004) (not improper for jury foreperson, a

3   physician, to express her opinion that the defendant's mental illness caused him to commit the

4   crime and that he would receive adequate mental health care in prison); United States v.

5   Navarro-Garcia, 926 F.2d 818, 821-822 (9th Cir. 1991) (not improper for a juror to rely on

6   his/her past personal experiences when hearing a trial and deliberating on a verdict as long as

7   personal experiences are relevant only for purposes of interpreting the record evidence).

8              On collateral review, trial errors-such as extraneous information
            that was considered by the jury-are generally subject to a 'harmless
9            error' analysis, namely, whether the error had 'substantial and
            injurious' effect or influence in determining the jury's verdict.
10           Jeffries v. Wood, 114 F.3d 1484, 1491 (9th Cir. 1997)) (citing
            Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)); see also
11           Sassounian v. Roe, 230 F.3d. 1097, 1108 (9th Cir. 2000).

12   Estrada, 512 F.3d at 1235.  See also Fields v. Brown, 431 F.3d 1186, 1209 n.16 (9th Cir. 2005)

13   (noting that Brecht provides the standard of review for harmless error in cases involving

14   unconstitutional juror misconduct); Thompson v. Borg, 74 F.3d 1571, 1574-76 (9th Cir. 1996)

15   (applying Brecht harmless-error standard when a venire member stated during voir dire that he

16   had read in a newspaper that the defendant had "pleaded guilty at one time and changed it").  Cf.

17   Caliendo v. Warden of California Men's Colony, 365 F.3d 691, 695-98 (9th Cir. 2004)

18   (recognizing that United States Supreme Court jurisprudence requires courts to presume

19   prejudice in cases involving unauthorized contact between a juror and a witness, an interested

20   party, or the officer in charge).[5]  The following factors are relevant to determining whether the

21   alleged introduction of extrinsic evidence constitutes reversible error: (1) whether the extrinsic

22   material was actually received, and if so, how; (2) the length of time it was available to the jury;

23

24      [5] It is true that "[t]he presence of a biased juror is a structural error, not subject to the
   harmless error analysis, and if one is found the defendant is entitled to a new trial."  Estrada, 512
25   F.3d at 1235 (citing Dyer v. Calderon, 151 F.3d 970, 973 n.2 (9th Cir. 1998) (en banc)).
   However, there is no evidence here suggesting that any of petitioner's jurors were biased.
26   Accordingly, harmless error review is appropriate in this case.

12

1  (3) the extent to which the jury discussed and considered it; (4) whether the material was

2  introduced before a verdict was reached, and if so, at what point in the deliberations it was

3  introduced; and (5) any other matters which may bear on the issue of whether the introduction of

4  extrinsic material substantially and injuriously affected the verdict.  Estrada, 512 F.3d at 1238.

5  See also Sassounian v. Roe, 230 F.3d 1097, 1109 (9th Cir. 2000).

6         As explained above, the California Court of Appeal assumed that all of the jury's

7  actions challenged by petitioner constituted misconduct, but concluded that the misconduct was

8  harmless.  In order to grant habeas relief where a state court has determined that a constitutional

9  error was harmless, a reviewing court must determine: (1) that the state court's decision was

10  "contrary to" or an "unreasonable application" of federal law with respect to harmless error, and

11  (2) that the petitioner suffered prejudice under Brecht as a result of the constitutional error.

12  Inthavong v. LaMarque, 420 F.3d 1055, 1059 (9th Cir. 2005) (concluding that the decision of the

13  state appellate court that any error in the admission of petitioner's confession in his murder trial

14  was harmless beyond a reasonable doubt, was objectively reasonable); see also Mitchell v.

15  Esparza, 540 U.S. 12, 17-18 (2003) (when a state court determines that a constitutional error is

16  harmless, a federal court may not award habeas relief under § 2254 unless that harmlessness

17  determination itself was unreasonable).  Both of these tests must be satisfied before federal

18  habeas relief can be granted.  Inthavong, 420 F.3d at 1061.

19         This court will assume, as did the state appellate court, that petitioner's jurors

20  committed misconduct when they considered extrinsic evidence in the form of definitions

21  contained in Black's Law Dictionary and one of the juror's professed "expertise" about "heat of

22  passion" as well as the effects of a .22 caliber bullet on the human body, and when the jury

23  foreperson failed to submit all of Juror H's proposed questions to the trial judge.  However, for

24  the reasons explained by the California Court of Appeal, and under the circumstances of this

25  case, that misconduct could not have had a substantial and injurious effect or influence in

26  determining the jury's verdict.  See Fields, 503 F.3d at 783 (concluding that jury's consideration

1  of dictionary definitions did not have a substantial and injurious effect or influence in

2  determining the jury's verdict); United States v. Kupau, 781 F.2d 740, 744-45 (9th Cir. 1986)

3  (jurors use of dictionary harmless beyond a reasonable doubt where, among other things,

4  government's case was clear-cut, words had negligible bearing on the case, and there was no

5  indication that jury may have been deadlocked).  Cf. Marino v. Vasquez, 812 F.2d 499, 505 (9th

6  Cir. 1987) (juror's use of dictionary to define malice resulted in prejudice to defendant where

7  juror who received dictionary definition had held out against a guilty verdict on a murder charge

8  for nearly 30 days, but changed his vote to guilty shortly after receiving definition).[6]

9          This court also notes that petitioner's jury was instructed that they

10             must accept and follow the law as I state it to you, regardless of
               whether you agree with it.  If anything concerning the law said by
11             the attorneys in their arguments or at any other time during the trial
               conflicts with my instructions on the law, you must follow my
12             instructions.

13  (Clerk's Transcript on Appeal (CT) at 169.)  The jurors are presumed to have followed the

14  court's instruction to determine the requirements of the law from the jury instructions alone.

15  Kansas v. Marsh, 548 U.S. 163, 179 (2006); Richardson v. Marsh, 481 U.S. 200, 206 (1987)

16  (applying "the almost invariable assumption of the law that jurors follow their instructions").

17  See also United States v. Bagnariol, 665 F.2d 877, 888-89 (9th Cir. 1981) (juror's independent

18  library research not prejudicial where research itself was immaterial and irrelevant, the evidence

19  /////

20

21          [6] In the traverse, petitioner argues that trial testimony to the effect that the "wound
    channel caused by the bullet was a straight line" was "relied on by the defense to establish that
    the gun was fired 'from the hip' and hence was not aimed at the victim to kill."  (Traverse at 28.)
22  Petitioner argues that the jurors' reliance on their "expertise" during deliberations to conclude
    that the bullets "would bounce around inside the body" refuted the trial testimony and was
23  therefore prejudicial.  (Id.)  A defense pathologist testified that he determined, based on where
    the bullet entered and exited McCain's body, that petitioner held the gun at elbow level when he
24  fired the shots.  (Reporter's Transcript on Appeal (RT) at 386-89.)  The pathologist did not
    testify that his opinion depended on the exact path of the trajectory.  (Id.)  Under these
25  circumstances, as noted by the state appellate court, "whether the bullet passed through McCain's
    body in a 'straight line' or whether it 'bounced around inside' before passing through was not
26  relevant."  (Opinion at 9.)

1   against the defendants was overwhelming, and trial judge instructed the jury throughout the trial

2   and during summation to consider only evidence produced at trial).

3           The conclusion of the California Court of Appeal that any jury misconduct in this

4   case was harmless is not contrary to or an unreasonable application of Brecht.  Accordingly,

5   petitioner is not entitled to habeas relief on the claim before this court.  Esparza, 540 U.S. at 17-

6   18; Inthavong, 420 F.3d at 1059.

7         B.  Response to Jury Question

8           Petitioner claims that his constitutional rights to a "jury trial and due process"

9   were violated "by the trial judge's failure to properly respond to the juries inquiry regarding what

10  constitutes heat of passion." (Pet. at pg. 9 of 20.)  The California Court of Appeal rejected this

11  claim, reasoning as follows:

12                Appellant contends the trial court erred when responding to two
              questions that had been posed by the jurors.  The first question was

13                as follows: "In defining a 'reasonable person' is this a person with
              the same background, life style, and life experiences as the

14                defendant?"

15                The trial court responded by reinstructing the jurors with the
              modified version of CALJIC No. 8.42 that appellant's counsel had

16                prepared.  The court told the jurors:

17                "'To reduce an unlawful killing from murder to manslaughter upon
              the ground of sudden quarrel or heat of passion, the provocation,

18                whether verbal or otherwise, must be of the character and quality
              as naturally would excite and arouse the passion, and the assailant

19                must act under the influence of that sudden quarrel or heat of
              passion.  The heat of passion which will reduce a homicide to

20                manslaughter must be such a passion as naturally would be aroused
              in the mind of an ordinarily reasonable person in the same

21                circumstances.  A defendant is not permitted to set up his own
              standard of conduct and to justify or excuse himself because his

22                passions were aroused, unless the circumstances in which the
              defendant was placed and the facts that confronted him were such

23                as also would have aroused the passion of the ordinarily reasonable
              person faced with the same situation.  [¶]  Legally adequate

24                provocation may occur in a short or over a considerable period of
              time.  The question to be answered is whether or not, at the time of

25                the killing, the reason of the accused was obscured or disturbed by
              passion to such an extent as would cause the ordinarily reasonable

26

person of average disposition to act rashly and without deliberation and reflection and from passion rather than from judgment.'"

The court then added the following final comment: "So if the question is, in defining a reasonable person, is this a person with the same background, lifestyles, and life experiences as the defendant, I've read to you the instruction of law. The standard is an objective standard, not a subjective standard. That's why we use the reasonable person standard. *Basically, it's what anybody would have done, the ordinarily reasonable person*." (Italics added.)

Appellant now contends the portion of the court's concluding remarks that we italicized "improperly suggested that to negate malice under a heat of passion theory, the jury must find that a reasonable person in the same circumstances would have *killed*." (Italics in original.)

We reject this argument because it is not reasonably likely the jurors interpreted the comment as appellant suggests. (People v. Cain (1995) 10 Cal.4th 1, 36.) The court did not state or suggest that to negate malice under a heat of passion theory jurors must find a reasonable person in the same circumstances would have killed. The court's comment, read in context, clearly was meant to reinforce to the jurors the fact that when determining whether a heat of passion defense applied, they must evaluate how an "ordinarily reasonable person of average disposition" would react. That is a correct statement of the law. (See CALJIC No. 8.42.) We find no error.

The second question the jurors submitted was "Are verbal threats enough to constitute 'provocation' as defined in voluntary manslaughter?"

The court answered as follows:

"The next question: 'Are verbal threats enough to constitute provocation as defined in voluntary manslaughter?' [¶] Referencing back to 8.42, it states that 'To reduce an unlawful killing from murder to manslaughter, upon the ground of sudden quarrel or heat of passion, the provocation, whether verbal or otherwise, must be of the character and degree as naturally would excite and arouse the passion, and the assailant must act under the influence of that sudden quarrel or heat of passion.' [¶] I'm going to re-read the instruction I just read to you, because the question here is: Are verbal threats enough to constitute provocation? [¶] 'The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which the defendant was placed and

16

1   the facts that confronted him were such as also would have aroused
    the passion of the ordinarily reasonable person faced with the same
2   situation.' [¶] So the question is 'Are verbal threats enough to
    constitute provocation?' This instruction says it depends on how
3   the ordinarily reasonable person would have responded."

4   Appellant now contends the trial court erred because it did nothing
    more than reinstruct the jurors with an instruction that had already
5   proven to be inadequate.

6   Section 1138 states that when the jury '"desire[s] to be informed
    on any point of law arising in the case . . . the information required
7   must be given . . . ."' Our Supreme Court has interpreted this
    language to mean the trial court "has a primary duty to help the
8   jury understand the legal principles it is asked to apply. [Citation.]
    This does not mean the court must always elaborate on the
9   standard instructions. Where the original instructions are
    themselves full and complete, the court has discretion under
10  section 1138 to determine what additional explanations are
    sufficient to satisfy the jury's request for information. [Citation.]
11  Indeed, comments diverging from the standard [instructions] are
    often risky. [Citation.]" (People v. Beardslee (1991) 53 Cal.3d 68,
12  97.)

13  Here, the trial court exercised its discretion and reinstructed with
    the modified standard instruction that had already been given. That
14  instruction was clear and complete and it explained that verbal
    provocation could support a heat of passion defense if that
15  provocation "would have aroused the passion of the ordinarily
    reasonable person faced with the same situation." We conclude the
16  court did not abuse its discretion when it declined to elaborate
    further.

17

18  (Opinion at 11-13.)

19          A challenge to jury instructions does not generally state a federal constitutional

20  claim.  See Middleton, 768 F.2d at 1085-86 (citing Engle, 456 U.S. at 119); Gutierrez v. Griggs,

21  695 F.2d 1195, 1197 (9th Cir. 1983).  "In the absence of a federal constitutional violation, no

22  relief can be granted even if the instruction given might not have been correct as a matter of state

23  law."  Mitchell v. Goldsmith,  878 F.2d 319, 324 (9th Cir. 1989).  Rather, to prevail, a habeas

24  petitioner must demonstrate that an erroneous instruction "'so infected the entire trial that the

25  resulting conviction violates due process.'"  Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten,

26  414 U.S. 141, 147 (1973)).  In making its determination, this court must evaluate the challenged

1    jury instructions "'in the context of the overall charge to the jury as a component of the entire

2    trial process.'"  Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Bashor v.

3    Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).

4              A trial judge enjoys "wide discretion" in responding to a question from the jury.

5    Arizona v. Johnson, 351 F.3d 988, 994 (9th Cir. 2003), cert. denied, 543 U.S. 836 (2004).  See

6    also Gilbrook v. City of Westminster, 177 F.3d 839, 860 (9th Cir. 1999) (trial judges have

7    "substantial latitude in tailoring jury instructions"); Wilson v. United States, 422 F.2d 1303, 1304

8    (9th Cir. 1970) ("The necessity, extent and character of additional instructions are matters within

9    the sound discretion of the trial court.").  To obtain habeas relief following an allegedly

10   erroneous response to a jury's request for clarification, a petitioner must show that (1) the

11   response was an incorrect or inaccurate application of state law, (2) constitutional error resulted

12   and (3) the error was not harmless.  See Morris v. Woodford, 273 F.3d 826, 833 (9th Cir. 2001).

13   To determine whether the error was harmless, this court must consider whether the error had a

14   "substantial and injurious effect or influence on the jury's verdict."  Calderon v. Coleman, 525

15   U.S. 141, 147 (1998).  In attempting to determine what the jury understood the judge's response

16   to mean, the response "may not be judged in artificial isolation, but must be considered in the

17   context of the instructions as a whole and the trial record."  Estelle, 502 U.S. at 72 (internal

18   quotations and citation omitted).  A jury is presumed to understand a judge's answer to its

19   question.  Weeks v. Angelone, 528 U.S. 225, 234 (2000).

20            Petitioner has failed to show that the trial court's responses to the jury's questions

21   were incorrect or inaccurate statements of state law.  The trial court referred the jury back to a

22   version of CALJIC No. 8.42 that had been approved of by petitioner's counsel.  (CT at 130, 205;

23   RT at 467.)  Under these circumstances, the trial court's clarifying instruction did not violate the

24   federal constitution.  Weeks, 528 U.S. at 234 (no constitutional violation where trial judge

25   responded to the jury's question by directing its attention to the paragraph of the constitutionally

26   adequate instruction that answered its inquiry); United States v. McCall, 592 F.2d 1066, 1068-69

18

1    (9th Cir. 1979) (where the district court's original instructions were a correct statement of the law

2    and "generally addressed the jury's question . . .," the court's re-reading of its original instructions

3    in response to the question was not reversible error); United States v. Collom, 614 F.2d 624, 631

4    (9th Cir. 1979) (where a deliberating jury asked, "[Does] aiding and abetting after the fact

5    constitute a violation of the law?," and the district court, in response, "reinstructed the jury on the

6    elements of aiding and abetting, and . . . specifically invited them to ask further questions should

7    the need arise," the court "acted well within [its] discretion"); Davis v. Greer, 675 F.2d 141,

8    145-46 (7th Cir. 1982) (where the "entire jury charge clearly and correctly stated the controlling

9    law," and the trial court responded to a jury question by saying only, "Consider all of the

10   instructions carefully," the "trial court's response was sufficiently specific to clarify the jury's

11   confusion").  Although the trial judge made additional comments, as described by the California

12   Court of Appeal, those comments simply restated in more general terms the content of CALJIC

13   No. 8.42.  None of the trial judge's supplemental remarks were incorrect or prejudicial to

14   petitioner.

15          Petitioner has also failed to establish prejudice with respect to this claim.  The

16   trial court specifically told the jurors that they could ask additional questions if they wished.

17   (Reporter's Transcript on Appeal  (RT) at 555.)  However, no further questions were asked by

18   the jury.  It therefore appears that the trial court's decision to simply refer the jury back to

19   CALJIC No. 8.42 succeeded in clarifying the matters of concern.

20          The decision of the California Court of Appeal that petitioner's right to due

21   process was not violated by the trial court's response to the jury's questions is not contrary to or

22   an unreasonable application of federal law.  Accordingly, petitioner is not entitled to relief on

23   these claims.

24                                    CONCLUSION

25          For the reasons set forth above, IT IS HEREBY RECOMMENDED that

26   petitioner's application for a writ of habeas corpus be denied.

1    These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3  days after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6  shall be served and filed within ten days after service of the objections.  The parties are advised

7  that failure to file objections within the specified time may waive the right to appeal the District

8  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  DATED: October 2, 2009.

10

11    _____

12    DALE A. DROZD
    UNITED STATES MAGISTRATE JUDGE

13  DAD:8:
   blair556.hc

14

15

16

17

18

19

20

21

22

23

24

25

26